UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| Thomas Houge<br><br>an Individual, a Connecticut resident<br><br>Plaintiff,<br>v.<br><br>Braman Motors, Inc.<br><br>a FloridaCorporation<br><br>State Farm Mutual Automobile Insurance Co.<br><br>an Illinois Corporation<br><br>Santander Consumer USA Inc.<br><br>a Texas Corporation<br><br>A+ Auto Collision Center LLC<br><br>A Florida Corporation<br><br>BMW of Bridgeport<br><br>A Connecticut Corporation<br><br>Charles Schwab Corporation<br><br>A California Corporation<br><br>Checkr Inc.<br><br>A California corporation<br><br>Defendants, | Civil Action No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Cause(s) of Action<br><br>1. Constitutional Violations and other Civil Wrongs<br>2. Fraudulent Misrepresentation<br>3. Breach of Contract<br>4. Tortious Interference with a Business Contract<br>5. Violation of 42 U.S. Code § 2000a –<br>6. Unlawful Acts and Practices<br>7. Promissory Estoppel/ Unjust Enrichment<br><br>FILED BY ___DR___ D.C.<br>Nov 5, 2021<br>ANGELA E. NOBLE<br>CLERK U.S. DIST. CT.<br>S. D. OF FLA. - Fort Lauderdale |

1

## COMPLAINT

COMES NOW the Plaintiff, Thomas Houge, a Connecticut resident presently temporarily domiciled in Miami, FL, (the "Plaintiff"), who sues the Defendants Braman Motors, Inc. a Florida Corporation, State Farm Insurance, an Illinois Corporation, Santander Consumer USA Inc, a Texas Corporation, A+ Auto Collision Center LLC , a Florida Corporation, Charles Schwab Corporation, a California Corporation and Checkr Inc., a California Corporation ( collectively "the Defendants") and further states as follows:

### JURISDICTION AND VENUE

Jurisdiction is proper in this case as the US District Courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States. Jurisdiction is therefore proper under 28 U.S.C. § 1332.

Jurisdiction is also proper in this case as the US District Courts shall have subject-matter jurisdiction to hear a civil cases alleging violations of the United States Constitution, federal law, or a treaty to which the United States is a party. Jurisdiction is therefore proper under 28 U.S.C. § 1331.

Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the relevant period, Defendants., resided, transacted business, were found, or had agents in this District, and a substantial portion of their activity that relate to interstate commerce occurred in this District.

### THE PLAINTIFF

Plaintiff, Thomas Houge is an individual, who at all times preceding this action is a resident of the State of Connecticut but having only a temporary domicile in Miami Dade County, FL. In the professional world, the Plaintiff serves as an Entrepreneur and also as Chief Executive Officer and CEO of Find, a well-known Tech Company which prior to this Complaint, was on the verge of several contractual prospects that would have brought billions of dollars in revenue to Plaintiff and his Company, which operates throughout the continental United States and the International Community.

### THE DEFENDANT(S)

2

1. The Defendant Braman Motors, Inc. operates as an automobile dealer. The Company engages in the retail sales of new and pre-owned vehicles, as well as provides automobile financing, auto parts, repair, and maintenance services. Braman Motors operates in the State of Florida.

2. The Defendant's Braman Motors, Inc.'s registered office is located at 2060 Biscayne Blvd Miami, FL 33137 but has several branches located throughout the State of Florida and the United States.

3. The Defendant State Farm is an Illinois mutual company that makes its primary focus its policyholders. The company has more than 55,000 employees and more than 19,000 independent contractor agents and provides service to 83 million policies and accounts throughout the U.S.

4. The Defendant Santander Consumer USA Holdings Inc. (NYSE:SC) is a Texas public, full-service, consumer finance company focused on vehicle finance and third-party servicing. The company manages accounts for more than three million customers across all credit profiles. Headquartered in Dallas, TX, Santander Consumer USA Holdings Inc. is the parent company of Santander Consumer USA Inc. ("SC").

5. The Defendant A+ Auto Collision Center LLC is a Florida incorporated automotive repair shop that specializes in offering superior restoration work on premier foreign and domestic vehicles in Miami FL.

6. The Defendant BMW of Bridgeport is a Connecticut owned BMW dealer that provides specialty services on BMW Vehicles throughout the continental United States.

7. The Defendant Charles Schwab Corporation (regarded also as Charles Schwab Bank is a multinational corporation in the bank and brokerage field or industry. They are based in San Francisco, California, USA and were founded in 1971 by the man himself, Charles R. Schwab. The company made it on the list of largest banks in the United States and is one of the largest brokerage firms in USA. The Defendant Charles Schwab Corporation is parent company to subsidiaries Schwab Holdings, Inc., Charles Schwab Bank, Charles Schwab Investment Management, Inc., Charles Schwab Futures, Inc., Charles Schwab Premier Bank, OptionsXpress, Schwab Performance Technologies, SoundView Technology Group, Charles Schwab Foundation, Charles Schwab Trust Bank and, TD Ameritrade.

8. The Defendant Checkr Inc. is a California company that operates a platform (either online access or an API) that browses and evaluates background reports that include national and county criminal records, driving history, SSN verification, previous addresses, etc.

**FACTUAL ALLEGATIONS**

1. On November 4, 2020 the Plaintiff upon invitation by the Defendant Braman, entered the Defendant Braman's business establishment in Miami Fl, to engage in pre-contractual negotiations with the Defendant Braman over the purchase of a vehicle that would be suitable for Plaintiff's needs as an Entrepreneur.

2. The Plaintiff and the Defendant Braman continued in their discussions with the Defendant Braman eventually including the Defendant BMW at Bridgeport in the conversation as Plaintiff desired a luxury style SUV; the Plaintiff and the Defendants Braman and BMW at Bridgeport eventually negotiated for the sale of a BMW X 5 vehicle worth $45,000 and the Defendant Braman, with the Defendant BMW at Bridgeport in the conversation , stated audibly that they were going to perform a soft credit check inquiry and represented further to Plaintiff that it would not affect the Plaintiff's credit upon doing so.

3. The Defendants Braman and BMW at Bridgeport, rather than performing a soft credit inquiry, did several hard inquiries into the Plaintiff's credit which subsequently caused Plaintiff's credit score to take a down spiral, a fact discovered by the Plaintiff only after the sale of the vehicle itself..

4. Plaintiff states that the Defendants used their leverage and/or bargaining power having already performed the hard credit inquiry checks to further persuade Plaintiff to pay more than the Plaintiff reasonably expected to pay for the vehicle, when initially negotiating for the vehicle's sale and purchase.

5. The parties then entered an agreement for the sale of the BMW x5 (the "subject vehicle") for the amount of $45,000, with Plaintiff having to pay $798.00 monthly, which was more than the Plaintiff had reasonably expected to pay per month for the vehicle; but with the hard inquiries on Plaintiff's credit initiated by the Defendants Braman and BMW at Bridgeport acting together, the Plaintiff felt forced to enter into the sale agreement for the Subject Vehicle.

6. Plaintiff states than not more than two months from purchasing the vehicle, there became a issue concerning the vehicle involving water and the vehicle became inoperable.
7. Plaintiff then contacted BMW's road side assistance but rather than wait, the Plaintiff had the car towed to BMW at his own expense with specific instructions not to repair the vehicle, but only to provide an estimate of the costs of repair after determining the damages.
8. Plaintiff states that repairs that were later determined to be faulty, was performed on the Subject Vehicle, without Plaintiff's consent.
9. Plaintiff states that the vehicle eventually was towed to the Defendant Braman at the Plaintiff's own expense, and in the vehicle, there was a check for the amount of $21,000 from State Farm insurance payable to the Plaintiff/s name, which Plaintiff had intended for other means.
10. Plaintiff states that on July 8, 2021 he entered the Defendant Braman's premises in an endeavor to have the vehicle returned and the Defendant Braman's agent, verbally refused to provide Plaintiff with the vehicle, the State farm check bearing his name, and also the parts which were removed from the vehicle, despite Plaintiff informing the Defendant Braman not to remove or repair.
11. During Plaintiff's visit to the Defendant's premises, one of the Defendant's agents started acting belligerent and the Miami Dade County Police were contacted.
12. Upon arrival at the scene, the Plaintiff was arrested and charged for disorderly conduct, trespass and resisting arrest without violence (three misdemeanors).
13. Plaintiff asserts that in the process of arresting Plaintiff, the Miami Dade Police officers violated the Plaintiff by touching his genitalia, all before placing Plaintiff in the back of the police's patrol car while his other personal vehicle remained on the Defendant Braman's premises, which Plaintiff discovered was later vandalized and relieved of his contents which included several pieces of Plaintiff's identification including his bank cards, debit cards and other personal information, inclusive of five hand held devices legally belonging to the Plaintiff.
14. Plaintiff asserts that his entire identity was stolen, either by the agents of the Defendant Braman or the Miami Dade County Police Officers that more than likely searched the vehicle after his arrest.

15. Plaintiff states that while in custody, he was informed that his personal car that he was driving would be placed outside of the gate of the Defendant Braman's premises and that said vehicle would be there upon his release from jail.
16. Plaintiff states that upon his release his personal vehicle was not placed outside of the Defendant Braman's gate but was rather vandalized, and that further, his personal effects including his identification had been removed and/or stolen.
17. Plaintiff states that he was never able to retrieve the physical check from State Farm that was in the BMW x 5 that was for $21,000, as it had presumably been stolen by the Defendant Braman.
18. Plaintiff states when he reported the check matter to his financial institution, that the Defendant Charles Schwab response was only to provide Plaintiff with the funds in small increments, to this day, and not the full amount as Plaintiff reasonably expected. Further, Plaintiff asserts that in order to receive the funds for the check, that the Defendant State Farm is obligated to liaise with the Defendant Santander Consumer USA Inc, to acknowledge the BMW X5 as a total loss (as the Plaintiff believes), thereby allowing the Defendant Charles Schwab to release any holds in order to issue to Plaintiff's $21,000 check to him. Plaintiff states that none of the Defendants mentioned in this paragraph have taken any action, all to the Plaintiff's detriment.
19. Plaintiff states that at the time of his release for the three misdemeanor charges that he had already spent over $4000 in towing fees, car rentals and in transportation costs such as lyft and uber, just to name a few. Further, the Plaintiff is still paying $798 for the BMW x5 that still remains in the possession of the Defendant and the issue has passed three (3) months. Further, Plaintiff states that the car is not presently in any arrears and that he neither owes the Defendant nor any of its agents, for any services.
20. Notwithstanding the above facts and allegations, Plaintiff states that upon his release from jail, that Plaintiff was provided a car by Benjamin Ferrer of Braman Motors, as a loaner, for a minimum use of thirty (30) days, but later made representations that he wanted Plaintiff to have the loaner car until the Subject Vehicle was repaired.
21. Plaintiff asserts that the car still has not been repaired and the Defendant Braman continues to perpetuate lies to this day.

22. During this time, while driving in Ft. Lauderdale, the keys which the Defendant Braman provided to the Plaintiff to the "loaned vehicle," suddenly became deactivated by its lender ( the Defendant Braman), and the car stopped working entirely. Subsequently, Plaintiff could no longer operate said vehicle and the Ft. Lauderdale police was contacted as they were informed that the vehicle had been purportedly stolen.

23. Plaintiff states that during his dealings with the Ft. Lauderdale police, they confiscated both the keys for the "loaned vehicle" and also the Plaintiff's personal keys in the process, as both keys had been on the same bunch.

24. Plaintiff states that he then acted reasonably and visited the Defendant's Braman's premises in order to obtain the replacement keys for the loaned vehicle and the Defendant Braman contacted the Miami Dade County Police a second time. Plaintiff was then arrested a second time, this time for burglary (F21-012750), which to date, Plaintiff sees no reason for said charge on his record.

25. Plaintiff spent one week in jail where he was subject to poison and other forms of unwanted embarrassment. Plaintiff further states that he was denied contact with his Attorney and also his family for the purposes of posting bail.

26. Plaintiff states that upon release, he was eventually sent the car keys which turned out to be wrong set of keys.

27. Plaintff states that upon an independent estimate of the BMW 5 vehicle paid for by Plaintiff, the vehicle itself is reportedly a total loss based off of the initial damages to the vehicle and the reported faulty repairs and removal of parts which Plaintiff did not request to be performed on the vehicle when in the Defendant Braman's possession.

28. Plaintiff states that as an entrepreneur he earns in excess of $6000 monthly and had a 758 credit score prior to Plaintiff's course of dealings with Defendant.

29. Plaintiff states that he has lost over $20,000 in out of pocket expenses alone in lyfts, Uber and towing fees etc…and continues to be billed $798 monthly for a vehicle that is not in his possession.

30. Plaintiff states that because of the identity theft issues which emanated because of Plaintiff's course of dealings which Defendant Braman, that the Plaintiff's remittance of the $21,000 State Farm insurance check in his name is being delayed with his financial institution, the Defendant Charles Schwab.

31. Plaintiff reiterates that the Subject Vehicle is a total loss and in the possession of the Defendant A+ Auto Collision Center LLC, which Company refuses to even allow Plaintiff to view the vehicle.
32. Plaintiff states that his credit, his business, his earning capacity, his identity and his reputation as a law abiding businessman has all been destroyed because of the above stated occurrences.
33. Plaintiff states further, that prior to his dealings with the Defendant Braman, he did not have a criminal record, however now, despite promises from the Judge on the charges against the Plaintiff being dropped, Plaintiff has to undergo the daunting task of pursuing an expungement, which provides no absolute guarantee that Plaintiff's personal liberties would ever be brought back into the status quo.
34. Plaintiff further states that the Defendant Checkr Inc. has to date refused to rectify Plaintiff's background check on its system database.
35. Plaintiff states that while no amount of money can compensate for the Plaintiff's losses to his reputation and earning capacity, that he seeks damages against the Defendants listed in this lawsuit in the amount of $6,,000,000,000 to be apportioned based on each Defendants' respective liability.
36. Plaintiff as grounds for asserting such damages, and as causes of action against the within named Defendants, further states as follows:

<center>CAUSE(S) OF ACTION</center>

<center>FIRST CAUSE OF ACTION</center>

**Constitutional Violations and other Civil Wrongs (As Against all Defendants)**

The Supreme Court's plainest description of a cause of action came in Davis v. Passman. 442 US 228 (1979). In that case, Shirley Davis sought damages from Representative Otto Passman for a violation of her right to equal protection under the Fifth and Fourteenth Amendments. Id. at 230–31, 242. Id. at 230–31, 242. As part of its analysis, the Court defined the concept itself. A cause of action exists, the Court explained, if the "plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." With the ability "to invoke the power of the court," Davis also makes clear that there are two ways to create a cause of action. First, Congress might create one itself. In enacting a statute, Congress might bestow on those who are injured by the violation of the statute the power to seek relief from the wrongdoer.

However, Congress can create causes of action for reasons other than to enforce statutory violations. Congress is free to create them in the constitutional realm as well, as it did with the so-called § 1983 action.36 Nevertheless, if Congress does not create a cause of action, the federal courts may do so. Such causes of action are known as "implied causes of action" Id. because the mere existence of a right implies, in some sense, their existence. Although Davis is only a single case, both courts and scholars have frequently relied upon its formulation of the cause of action. Moreover, neither courts nor scholars have ever discredited the formulation. Further, a judicially created cause of action often relates closely to rights. When federal courts are faced with the question of whether to create a cause of action, they often look for the cause within the right itself. Federal courts have found a cause of action to enforce one's due process rights "implicit in the Fifth Amendment" or to enforce one's right to humane treatment in prison "implied . . . from the Eighth Amendment." Id.

In sum In determining whether to imply a cause of action, the federal courts look to "congressional intent to provide a private remedy." Similarly, the availability of a cause of action often turns on the nature of the remedy sought. See. Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1102 (1991)).

Plaintiff in light of the foregoing asserts that the Defendants' Braman Motors, Inc.State Farm Insurance, Santander Consumer USA Inc,, A+ Auto Collision Center LLC , Charles Schwab and Checkr Inc. should be held liable according to each Defendants' respective participation in predicating violations of Plaintiff's constitutional rights under the fifth and fourteenth amendments to the US Constitution. Plaintiff asserts and requests that the Court note, that while no amount of money can fully compensate Plaintiff for his loss of identity, business reputation, impeccable criminal record, loss of future sales and future earning capacity, as damages collectively against all Defendants for their civil wrongs Plaintiff claims damages in the amount of $6,000,000,000.

## SECOND CAUSE OF ACTION
### Fraudulent Misrepresentation
### (As Against the Defendants Braman and BMW at Bridgeport)

The Florida Supreme Court has stated that the required elements of a cause of action for fraudulent misrepresentation are:

1) a false statement concerning a material fact;

9

2) the representer's knowledge that the representation is false;

3) an intention that the representation induce another to act on it; and

4) consequent injury by the party acting in reliance on the representation. *Johnson v. Davis,* 480 So. 2d 625, 627 (Fla.1985).

Plaintiff asserts that the Defendant Braman acting with the Defendant BMW at Bridgeport made:

1) a false statement concerning a material fact, when Defendant's sales agent made clear statements to Plaintiff that they were not going to perform a hard inquiry on Plaintiff/s credit,

2) the representer's knowledge that the representation is false;
Plaintiff states that Defendants knew that their statements were false since they did the exact opposite to what they represented to Plaintiff by actually performing a hard credit inquiry.

3) an intention that the representation induce another to act on it;
Plaintiff states that the Defendants, intentions in using false representations to induce Plaintiff to purchase the BMW x 5 was clear  as the Defendant Braman's  agent in conjunction with the Defendant BMW at Bridgeport, performed a hard credit inquiry with the intent of ensuring that Plaintiff purchase the vehicle, all despite their representations to Plaintiff that they were going to perform only a soft credit inquiry

4) consequent injury by the party acting in reliance on the representation.
 Plaintiff states that because of the Defendants' representation to Plaintiff which was later revealed to be false, that the Plaintiff suffered damages that surpasses the jurisdictional limit for entry of this case , Plaintiff as to this cause of action claims damages in the amount of $100,000,000.

Plaintiff further asserts that the Defendant BMW at Bridgeport is just as liable for fraudulent misrepresentation as the Defendant Braman as both companies would have communicated with each other for the purposes of making a decision to conduct a hard inquiry into the Plaintiff's credit, despite making claims to Plaintiff that only a soft inquiry was to be conducted.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT
### As Against the Defendant Braman

An adequately pled breach of contract action requires three elements:

(1) a valid contract; (2) a material breach; and (3) damages. *Friedman v. New York Life Ins. Co.,* 985 So.2d 56, 58 (Fla. 4th DCA 2008). This general rule was enunciated by various Florida

district courts of appeal. See *Murciano v. Garcia*, 958 So.2d 423, 423-24 (Fla. 3d DCA 2007); *Abbott Laboratories, Inc. v. General Elec. Capital*, 765 So.2d 737, 740 (Fla. 5th DCA 2000); *Mettler, Inc. v. Ellen Tracy, Inc.*, 648 So.2d 253, 255 (Fla. 2d DCA 1994); *Knowles v. C.I.T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977). To maintain an action for breach of contract, a claimant must first establish performance on the claimant's part of the contractual obligations imposed by the contract. *Marshall Construction, Ltd. v. Coastal Sheet Metal & Roofing, Inc.*, 569 So.2d 845, 848 (Fla. 1st DCA 1990). "Substantial performance is performance 'nearly equivalent to what was bargained for.'" *Strategic Resources Grp., Inc. v. Knight-Ridder, Inc.*, 870 So.2d 846, 848 (Fla. 3d DCA 2003). "Substantial performance is that performance of a contract which, while not full performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny the promisee the full contract price subject to the promisor's right to recover whatever damages may have been occasioned him by the promisee's failure to render full performance." *Ocean Ridge Dev. Corp. v. Quality Plastering, Inc.*, 247 So.2d 72, 75 (Fla. 4th DCA 1971).

Plaintiff asserts (1) that there was the existence of a contract between himself and the Defendant Braman for a fully functioning BMW X 5 vehicle worth $45,000.

Plaintiff further asserts that (2) the Defendant Braman materially breached the Agreement first through its fraudulent misrepresentation in their course of dealings with the Plaintiff and further given the fact that the Subject vehicle encountered problems not more than 2 months after its purchase.

Plaintiff further asserts that (3) Plaintiff suffered significant damages in not having the vehicle in his possession which is now a total loss ad further Plaintiff has suffered significant out of pocket expenses such as towing fees, transportation and losses in revenue because of not having the Subject Vehicle in his possession.

In light of the foregoing, Plaintiff requests that the Court, at the very least, award Plaintiff damages for breach of contract in the amount of $45,000.00, representing the cost of the Vehicle which Defendant paid for in its entirety before experiencing problems. Plaintiff states that at present the vehicle has afforded Plaintiff no real benefit and Plaintiff demands to be put in the position Plaintiff would have before being fraudulently induced to into enter into the agreement with the Defendant for the sale of the vehicle. Plaintiff states that while no amount of money can

fully compensate Plaintiff for his entire losses, under this cause of action, Plaintiff seeks damages in the amount of $45,000 which is the cost of the vehicle that is now a total loss and damages in the amount of $20,000 for the out of pocket expenses and inconvenience caused in not having the car in Plaintiff's possession from the date of the incident to the time of filing this case. Plaintiff asserts total damages for $65,,000 for Breach of Contract.

<p style="text-align:center"><strong>FOURTH CAUSE OF ACTION</strong></p>
<p style="text-align:center"><strong>Tortious Interference with a Business Contract</strong></p>
<p style="text-align:center"><strong>As Against Defendants Braman, State Farm, Santander, A + Auto and Checkr</strong></p>

Under Florida law, to state a claim for tortious interference with contract the claimant must plead four elements:

(1) the existence of a business relationship under which plaintiff has legal rights, not necessarily evidenced by an enforceable contract;

(2) proof of defendant's knowledge;

(3) intentional and unjustified interference with relationship by defendant; and

(4) damage to plaintiff as a result of interference. *Nautica Int'l. v. Intermarine USA, L.P.*, 5 F. Supp. 2d 1333, 1344 (S.D.Fla. 1998); *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 385 (Fla. 4th DCA 1999).

Several Florida courts have addressed the standard for courts to use in determining if the required element of an advantageous business relationship has been properly pled. The test is whether the parties' understanding would have been completed if the defendant had not interfered. See *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994), citing *Charles Wallace Co. v. Alternative Copier Concepts, Inc.*, 583 So. 2d 396, 397 (Fla. 2d DCA 1991) (holding action for intentional interference with business expectancy will lie if the parties' understanding would have been completed if the defendant had not interfered); see also *United Yacht Brokers, Inc. v. Gillespie*, 377 So. 2d 668, 672 (Fla.1979) (holding question is not necessarily whether interference induced a breach of contract, but more generally, whether it caused a loss of gain plaintiff would have received absent the interference.) Plaintiff asserts:

(1) the existence of a business relationship under which plaintiff has legal rights, not necessarily evidenced by an enforceable contract;

    Plaintiff asserts that he can provide evidence of several contractual engagements which he missed as a result of his course of dealings with the Defendants Braman, State Farm, Santander, Charles Schwab, A +Auto and Checkr

(2) proof of defendant's knowledge;

    Plaintiff can provide evidence in the form of several phone conversations with the Defendants Braman, State Farm, Santander, Charles Schwab, A +Auto and Checkr informing the Defendants that he was an entrepreneur and that Defendants' subsequent delay in providing the necessary actions in the best interest of the Plaintiff, their customer, was in fact costing Plaintiff several daily losses in missed engagements.

(3) intentional and unjustified interference with relationship by defendant;

    Plaintiff states that he contacted the Defendants' agents on several times concerning the vehicle, its unauthorized repairs, State Farm's delayed transfer to Santander, Santander's further delay and said Defendant State Farm, Braman's, A+ Auto participation in arbitrarily deciding to not provide Plaintiff with his vehicle when requested, including the Defendant Braman specifically creating an Avenue or platform for Plaintiff's identity to be stolen, was both unintentional and unjustified interference with Plaintiff's business relationships with his clients by said defendants, and

(4) damage to plaintiff as a result of interference.

    Plaintiff asserts that as a result of Defendant's interference, Plaintiff a Trch CEO and Entrepreneur sustained damages in excess of $2,040,000,000 as a result of loss of out of pocket expenses, loss of identity, lost business engagements and future revenue and earning capacity.

## FIFTH CAUSE OF ACTION

**IV. Violation of 42 U.S. Code § 2000a - Prohibition against discrimination or segregation in places of public accommodation**

**As Against Defendant Braman**

    Plaintiff asserts a separate Cause of Action for Discrimination and states that the Defendant Braman discriminated against Plaintiff on the basis of his race. Plaintiff asserts that he entered the Defendant's premises, a public place, during regular business hours to conduct business and was immediately discriminated against as a result of his Israeli background and was initially perceived

to be the aggressor and subsequently had the police called on him who further perpetuated the Defendant's aims when they arrested him. Plaintiff under this cause of action seeks damages in the amount of $100,000,000. Notwithstanding the above claim for discrimination, Plaintiff asserts that an EEOC complaint will be filed in addition to this Complaint specifically addressing this cause of action.

<div align="center">

### SIXTH CAUSE OF ACTION
### UNLAWFUL ACTS AND PRACTICES

</div>

**As Against the Defendant Braman**

Plaintiff states that for the reasons provided in Counts 1 through 5 Defendant Braman should be held liable for Unlawful Acts and Business Practices.

**501.204   Unlawful acts and practices.—**

(1)   Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(2)   It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017.

**501.2075  Civil penalty.**--Except as provided in s. 501.2077, any person, firm, corporation, association, or entity, or any agent or employee of the foregoing, who is willfully using, or has willfully used, a method, act, or practice declared unlawful under s. 501.204, or who is willfully violating any of the rules of the department adopted under this part, is liable for a civil penalty of not more than $10,000 for each such violation. Willful violations occur when the person knew or should have known that his or her conduct was unfair or deceptive or prohibited by rule. This civil penalty may be recovered in any action brought under this part by the enforcing authority; or the enforcing authority may terminate any investigation or action upon agreement by the person, firm, corporation, association, or entity, or the agent or employee of the foregoing, to pay a stipulated civil penalty. The department or the court may waive any such civil penalty if the person, firm, corporation, association, or entity, or the agent or employee of the foregoing, has previously made full restitution or reimbursement or has paid actual damages to the consumers or governmental

entities who have been injured by the unlawful act or practice or rule violation. If civil penalties are assessed in any litigation, the enforcing authority is entitled to reasonable attorney's fees and costs. A civil penalty so collected shall accrue to the state and shall be deposited as received into the General Revenue Fund unallocated.

Plaintiff seeks punitive damages under this cause of action in the amount of $100,000,000.

## SEVENTH CAUSE OF ACTION

### Promissory Estoppel/Detrimental Reliance As Against the Defendant Braman

The law in Florida, with respect to the doctrine of promissory estoppel, was stated in *Mt. Sinai Hospital of Greater Miami, Inc. v. Jordan,* 290 So. 2d 484(Fla.1974). Although the Florida Supreme Court did not apply the doctrine of promissory estoppel to enforce a promise under the facts of *Mt. Sinai,* the court did endorse promissory estoppel as a viable cause of action and it set out the applicable requirements. The *Mt. Sinai* decision, the most recent by the Florida Supreme Court on the subject of promissory estoppel, states: "For the doctrine of promissory estoppel to be applicable, the promisor must make a promise which he should reasonably expect to induce action or forbearance of a substantial character on the part of the promisee ..." *Id.* at 486. Usually, one party is claiming the other party made them a promise and then did not deliver on that promise. Promissory estoppel in Florida is a claim that someone can bring when there are no contract claims available. These types of claims are also known as "detrimental reliance" claims.

There are three specific elements of promissory estoppel in Florida:

(i) The defendant promised the plaintiff something and should have expected the plaintiff to act or not act based on that promise (called "affirmative representation"); Plaintiff asserts that the Defendant provided assurances to Plaintiff that he would have received both his vehicle and his State farm check in a particular time frame which did not happen

(ii) The plaintiff actually relied on the defendant's promise and did or didn't do something (called "detrimental reliance"); Plaintiff states that he expended over $5000 in rental cars, uber and lyft rides and towing expenses, and also pays $798 monthly for a vehicle which he does not have in his possession, and

(iii)  Enforcing the promise is necessary to avoid injustice to the plaintiff; Plaintiff asserts that since the vehicle is presently a total loss there is nothing more for the court to do but to compensate the Plaintiff for the expenses incurred as a result of Defendant's breach of its promise. Plaintiff assert these damages to be the total amount of $60,,000 in out of pocket expenses.

Plaintiff states that, in a promissory estoppel case, the court will award the plaintiff reliance damages. Reliance damages, are those that put the plaintiff back in the position they were in before they relied on the promise. Plaintiff therefore asserts reliance damages for $50,000 on the grounds of Promissory Estoppel and Plaintiff's detrimental reliance on the Defendant's promise.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

1. Award Plaintiff damages against all Defendants for their respective constitutional violations and/or civil wrongs collectively in the amount of $6,000,000,000.
2. Notwithstanding the above claim for damages, Award Plaintiff damages Defendants Braman and BMW at Bridgeport for their joint liability for fraudulent misrepresentation in the amount $100,000,000.
3. Award Plaintiff damages against the Defendants Braman for breach of contract in the amount of $100,000,000.
4. Award Plaintiff damages against Defendants Braman, State Farm, Santander A + Auto and Checkr for their joint liability for tortious interference with a business contract in the amount of $2,,040,000,000
5. Award Plaintiff damages against the Defendant Braman for their discrimination in the amount of $100,000,000
6. Plaintiff seeks punitive damages against the Defendant Braman for their Unlawful Acts and Business Practices in the amount of $100,000,000
7. Award Plaintiff equitable damages against the Defendant Braman for unjust enrichment in the amount of $60,0000

Plaintiff asserts total damages in the amount of $6,000,000,000.

## **JURY DEMAND**

Plaintiffs demand trial by jury of all issues so triable.

Respectfully Submitted,

10/4/2021

Thomas Houge
Plaintiff, Pro Se
FindTravelers@pm.me
757 SE 17th Street, #1087
Ft. Lauderdale, FL 33316

T. HOUGE
757 SE 17TH ST #1087
FORT LAUDERDALE, FL 33316

USDC, SOUTHERN DISTRICT
299 EAST BROWARD BLVD
ROOM 108
FORT LAUDERDALE, FL 33301



ing
ing
shredding
notarizing
faxing
mailboxing
freighting
returning
designing
theupsstore.com
theupsstorefranchise.co
THOMAS HOUGE
(203) 572-3360
THE UPS STORE #0888
757 SE 17TH ST
FORT LAUDERDALE FL 33316-2954
0.4 LBS LTR 1 OF 1
SHP WT: LTR
DATE: 04 NOV 2021
SHIP TO: USDC SOUTHERN DISTRICT
STE 108
299 E BROWARD BLVD
FORT LAUDERDALE FL 33301-1922
FL 333 0-04
UPS NEXT DAY AIR 1
TRACKING #: 1Z 378 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 7773
BILLING: P/P
FILED BY ____ D.C.
NOV - 5 2021
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.
UPS

Visit **theupsstore.com** to find a location near you.

**Domestic Shipments**
- To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

**International Shipments**
- The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.
- To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

**Note:** Express Envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.



USDC SOUTHERN DISTRICT
299 E BROWARD BLVD
STE 108
FORT LAUDERDALE FL 33301

P:BLUE   S:RIGHT
45-1314   51D

12378137015028 7773
SAT08485 Nov 9 04:25:05 2021
US 3330 HIPPS 21.0.0 SAT084854L      1030

100% Recycled fiber
80% Post-Consumer

Serving you for m
Uni

International Shipping Notice — Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the the Convention on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversio